IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**LINCOLN BENEFIT LIFE COMPANY,**

         **Plaintiff,**

vs.                                           Civ. No.  14-1077 JCH/WPL

**BERTHA GUERRERO, IGNACIA CISNEROS,**
**and IMARA GUERRERO, Personal Representative**
**of Estate of Decedent Neftaly Guerrero,**

         **Defendants.**

## MEMORANDUM OPINION AND ORDER

This insurance dispute is before the Court on *Defendant Imara Guerrero's Motion for Summary Judgment* [Doc. 38], in which she seeks a ruling that the Estate of the Decedent, Neftaly Guerrero, is entitled to the proceeds from the life insurance policy issued by Lincoln Benefit Life Company. Neftaly Guerrero's ex-wife, Bertha Guerrero, and Lincoln Benefit Life Company, have filed response briefs. [Docs. 39, 41], to which Imara Guerrero has replied. [Docs. 43, 44]. After considering the briefs, the evidence, and the applicable law, the Court concludes that the motion should be granted, and judgment should be entered in favor of Imara Guerrero as Personal Representative of the Estate of Neftaly Guerrero.

## MATERIAL FACTS

Most of the facts of this case are undisputed, unless otherwise noted.

Plaintiff, Lincoln Benefit Life Company ("Lincoln Benefit"), issued life insurance policy No. 01N1088144 ("the Policy") on the life of Neftaly Guerrero ("the Decedent"), for a death benefit in the amount of $125,000.00. Doc. 4-1. The Decedent designated his then wife,

Defendant Bertha Guerrero ("Bertha") as the primary beneficiary in the event of his death. He designated Bertha's mother, Defendant Ignacia Cisneros ("Cisneros"), as the contingent beneficiary.[1]

In 2003, the Decedent and Bertha divorced. The order entered by the Second Judicial District Court, Bernalillo County, New Mexico, dissolved their marriage but did not provide that Bertha would remain the primary beneficiary; indeed, it made no mention of the policy whatsoever. Doc. 4-2. In June of 2008, Decedent and Bertha met with Christopher Rael, an insurance agent contracted with Lincoln Mutual, regarding the Policy as well as the policy covering Bertha's life. Doc. 39-2, Rael Aff., at ¶ 14. The purpose of the meeting was to sever the policies so that they could each own separate, independent life insurance policies. Rael Depo. at 52, 99; Rael Aff. at ¶ 14.

According to Rael, at that meeting Bertha completed an Application for Term Conversion. Rael Depo. at 53; Doc. 39-1(E), Application for Term Conversion. The Decedent was not required to, and did not, complete such an application himself, though he did sign Bertha's application, thereby authorizing the insurance split. Rael Depo. at 53; Doc. 39-1(E); Rael Aff. at ¶ 17; Bertha Guerrero Aff. at ¶ 14 (Decedent "approved of the application process for conversion of the Original Policy into two separate policies and signed the Application for Term Conversion on August 1, 2008."). The Application identifies Bertha as the "Person Proposed for Conversion." Doc. 39-1(E). It sets forth "Policy Information," such as the new face amount and the current term policy face amount. *Id*. It names Bertha as the primary insured, sets forth premium amounts for her new policy, and states that Bertha already owns insurance which

---

[1] Cisneros has since released and disclaimed any right or interest she may have in the Policy proceeds. Doc. 8. Thus, at this time only Bertha and the Decedent's estate assert claims to the proceeds.

2

will be changed as a result of the Application. *Id*. The Decedent's signature appears at the bottom of each page. *Id*. On the final page, Decedent signed on the line marked "Signature of Previous Owner." *Id*. There is nothing in the Application stating that the owner of the original Policy is in any way reaffirming adopting its terms.

The Decedent did not make any new beneficiary designation for his own life insurance policy in June of 2008, or at any time after the divorce. Doc. 38-2 at 2. In fact, other than authorizing the split by signing the Application for Term Conversion, the Decedent made no alterations to his policy after the divorce. Rael Depo. at 53. However, it was Rael's "understanding" or belief that by signing the Application for Term Conversion (as he was required to do to authorize the split in the policies), the Decedent "adopted" the information contained therein, including the beneficiary designations, and "no further action was required of him." Rael Aff. at ¶ 21, 23. After Decedent signed the Application for Term Conversion, Rael informed Decedent that he could change his beneficiary designation by filling out certain forms, but he declined. Rael Aff. at ¶ 22; Rael Depo. at 72, 100, 113. The Decedent said nothing to Rael about wanting to change the beneficiary designation on his policy and did not fill out a change of beneficiary form. *Id*. at 99-100. On the other hand, at no time after the divorce did Decedent ever expressly tell Rael that he wanted to keep Bertha as his beneficiary. Rael Depo. at 113.

In her own affidavit, Doc. 39-1, Bertha avers that the Decedent's desire was that she "would continue on as the primary beneficiary and [Ignacia] would continue on as a contingent beneficiary, despite the split of the policy." Bertha Guerrero Aff. at 10. She states that both she and Decedent "were led to believe that all he needed to do for [Bertha] to continue to be listed as his previously listed beneficiary designation, as listed in the Application for Insurance, was to sign the Application for Term Conversion on August 1, 2008." *Id*. at ¶ 15. Bertha avers that she

and Decedent signed the Application for Term Conversion only after Rael advised Decedent "that if he wished to change the designated beneficiary as part of the split that he needed to complete a Change of Beneficiary, which he declined to do." *Id*. at ¶ 16. Finally, Bertha asserts that after the policy split and continuing until May 21, 2012, she paid the monthly premiums on the policy held by the Decedent, with the reasonable expectation and understanding that she was the designated beneficiary who would receive the policy proceed in the event of his death. *Id*. at 17-18.

The Decedent died on March 2, 2014. In August of 2014, Lincoln Benefit received notice of the Decedent's death, as well as the fact of his previous divorce from Bertha. In August of 2014, Lincoln Benefit received a copy of the order dissolving the marriage, as well as a claim from Bertha for the proceeds under the Policy. Lincoln Benefit took the position that, based on a New Mexico statute[2], Bertha and Cisneros' beneficial interests may have been revoked upon the dissolution of the marriage between Bertha and Decedent. According to Lincoln Benefit, it cannot determine what right, if any, Bertha and Cisneros have to the Policy proceeds, and that if neither has a right to those Proceeds, then Decedent's estate has a potential right to the proceeds.

On June 18, 2015, Defendant Imara Guerrero ("Imara") filed her answer [Doc. 18] to the Amended Complaint. Imara is the Personal Representative of Decedents estate. In her answer, Imara asserted that neither Bertha nor Cisneros has a right to the Policy proceeds, and that in the absence of a named beneficiary those proceeds should accrue to the estate. She argues that under New Mexico law, the Decedent's designation of Bertha as the beneficiary of the Policy was automatically revoked at the time of their divorce, and he never took any affirmative action after the divorce to rename Bertha as the beneficiary. On January 19, 2016, Imara filed the motion for

---

[2] NMSA 1978, § 45-2-804(B)(1).

summary judgment currently at issue before the Court [Doc. 38] asserting that the estate—not Bertha—is entitled to the Policy proceeds.

## LEGAL STANDARD

Summary judgment is warranted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The substantive law of New Mexico governs the Court's consideration of the merits of Plaintiffs' claims. As a federal court sitting in diversity, this Court's task is "simply to 'ascertain and apply'" New Mexico law, attempting to "predict what the state's highest court would do" if faced with the specific issues before it. *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003) (quoting *Huddleston v. Dwyer*, 322 U.S. 232, 236 (1944)).

## DISCUSSION

The question raised by the motion for summary judgment is whether or not Bertha is the beneficiary of the Policy under New Mexico law. As Personal Representative of the estate, Imara argues that under NMSA 1978, § 45-2-804, the Decedent's designation of Bertha as the beneficiary was legally revoked at the time of the divorce, and that Decedent never took affirmative steps to redesignate her (or anyone else) as beneficiary. Thus, Imara argues that the Policy proceeds should inure to the Decedent's estate. In response, Bertha does not dispute the applicability of § 45-2-804, or its effect in revoking her designation as beneficiary. Instead, Bertha argues that after the divorce, the Decedent evidenced his intent to have her remain as the beneficiary of the Policy, and the Court should give effect to that intent. Thus, the motion presents the following legal issues: (1) does § 45-2-804 create a bright line rule requiring revocation of a beneficiary designation upon divorce, or does it merely create a rebuttable

5

presumption that the donor intended revocation, and (2) if § 45-2-804 creates a rebuttable presumption, what amount of proof is required to rebut it?

I.   **THE NEW MEXICO REVOCATION STATUTE**

This case is before the court on diversity jurisdiction. Doc. 4 at ¶ 6. Accordingly, the Court must apply the substantive law of New Mexico, the forum state, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), which none of the parties dispute.

In 1993, the New Mexico Legislature enacted § 45-2-804, which provides that a divorce automatically rescinds any existing revocable disposition or appointment of property made by a divorced person to his or her former spouse. Specifically, NMSA 1978, § 45-2-804(B) states, in relevant part:

> **B.** Except as provided by the express terms of a governing instrument, a court order or a contract relating to the division of the marital estate made between the divorced individuals before or after the marriage, divorce or annulment, the divorce or annulment of a marriage:
> (1) revokes any revocable:
> (a) disposition or appointment of property made by a divorced individual to the former spouse in a governing instrument and any disposition or appointment created by law or in a governing instrument to a relative of the divorced individual's former spouse;

Thus, the only exceptions to the automatic revocation outlined above are for (1) the express terms of the governing instrument, (2) a court order (such as a divorce decree that expressly exempts the governing instrument from revocation), and (3) a contract relating to the division of the marital estate. There is no argument by any party that any of these three exceptions applies in this case.

The statute defines "governing instrument" as an instrument "executed by the divorced individual before the divorce or annulment of the divorced individual's marriage to the former spouse." § 45-2-804(A)(4). None of the parties dispute that a life insurance policy such as the

Policy at issue in this case is a "governing instrument" within the meaning of the statute. "Disposition or appointment of property" includes "a transfer of an item of property or any other benefit to a beneficiary designated in a revocable trust or other governing instrument." § 45-2-804(A)(1). The statute also defines the term "revocable":

> "revocable", with respect to a disposition, appointment, provision or nomination, means one under which the divorced individual, at the time of the divorce or annulment, was alone empowered by law or under the governing instrument to cancel the designation in favor of the former spouse or former spouse's relative whether or not the divorced individual was then empowered to designate the divorced individual's own self in place of the former spouse or in place of the former spouse's relative and whether or not the divorced individual then had the capacity to exercise the power.

None of the parties dispute that appointment of a spouse as a beneficiary to a life insurance policy is a revocable appointment.

## II.     ANALYSIS

The New Mexico state courts have had no occasion to interpret § 45-2-804(B). However, the New Mexico statute is based upon Section 2-804 of the Uniform Probate Code ("UPC").[3] Many other states have adopted this UPC provision, or ones nearly identical thereto. As a result, this Court has the benefit of several decisions from state and federal courts in those jurisdictions interpreting the statute in situations similar to the facts in this case.

---

[3] (b) [Revocation Upon Divorce.] Except as provided by the express terms of a governing instrument, a court order, or a contract relating to the division of the marital estate made between the divorced individuals before or after the marriage, divorce, or annulment, the divorce or annulment of a marriage:
   (1) revokes any revocable
   (A) disposition or appointment of property made by a divorced individual to his [or her] former spouse in a governing instrument and any disposition or appointment created by law or in a governing instrument to a relative of the divorced individual's former spouse,

7

In *Stillman v. Teachers Ins. And Annuity Ass'n College Retirement Equities Fund,* 343 F.3d 1311 (10th Cir. 2003), the Tenth Circuit examined the impetus behind Utah Code Ann. § 75-2-804(2) (which is virtually identical to its New Mexico counterpart) and the Uniform Probate Code provision upon which both state statutes are based. The Court noted that the discord that drives a couple to divorce usually also signifies a desire to remove the alienated spouse as a beneficiary on a will, insurance policy, retirement account, or other donative instrument, but often individuals fail to take affirmative action to change the beneficiary designation:

> The Uniform Probate Code provision on which § 75-2-804(2) is modeled derives from the recognition that when spouses are sufficiently unhappy with each other that they obtain a divorce, neither is likely to want to transfer his or her property to the survivor on death. Revocation-upon-divorce statutes reflect the legislative judgment that when the transferor leaves unaltered a will or trust or insurance beneficiary designation in favor of an ex-spouse, this failure to designate substitute takers more likely than not represents inattention rather than intention. Thus, § 75-2-804(2) attributes an intent to the donor based on an assessment of a typical donor's intention. We also note that this statutory attribution of intent is rebuttable. It applies except as provided by the express terms of a governing instrument [such as an annuity contract], a court order, or a contract relating to the division of the marital estate. . . .

*Id*. at 1317-18 (internal citations and quotations omitted). *See also* E. Gary Spitko, *The Expressive Function of Succession Law and the Merits of Non–Marital Inclusion*, 41 ARIZ. L. REV. 1063, 1084 (1999) (observing that such revocation-upon-divorce provisions reflect a recognition that "the property owner is unlikely to wish to benefit her former spouse and, had she thought about it, probably would have revoked the pre-divorce beneficiary designation."). The *Stillman* court observed that the approach under the UPC was to withdraw the prior emphasis on legal formalism in interpreting wills, trusts, and other transfers in favor of policies that fulfilled the intent of the donor. 343 F.3d at 1317. Recognition of that intent means that usually a donor

must take some affirmative action after a divorce if he or she wishes a former spouse to remain a beneficiary. The question is what action can be considered sufficient.

For example, in *State Farm Life Ins. Co. v. Davis*, 2008 WL 2326323 (D. Alaska 2008) (unpublished), after their divorce the ex-husband verbally told his insurance agent that he wanted his former wife to remain as the beneficiary. Just as in this case, because the wife had already been designated as beneficiary, the agent did not believe that it was necessary for the husband to fill out a new beneficiary designation form, and so the husband did not do so. In ruling on a motion for summary judgment, the court stated that Alaska's revocation-upon-divorce statute, AS 13.12.804(a)(1)(A), created only a rebuttable presumption of revocation, "not a strict and inflexible rule." *Id*. at *4. The court further found that in order to rebut the presumption of revocation, the wife must present proof by a preponderance of the evidence of the decedent's intent for her to be the beneficiary after the divorce. *Id*. In *Davis*, the court found that the wife's proof—an oral statement by the decedent made to the insurance agent—was admissible non-hearsay evidence of decedent's state of mind under Fed. R. Evid. 803(3). *Id*. at *5. The court then held that this statement, in the absence of any contrary evidence of the husband's intent, rebutted the statutory presumption of revocation. *Id*.

However, in *In re Estate of Lamparella*, 109 P.3d 959 (Arizona Ct. App. 2005), the Arizona Court of Appeals took a slightly different approach in interpreting that state's version of UPC § 2-804. In that case, in 1996 the husband purchased a deferred annuity policy naming the wife as the beneficiary. *Id*. at 960. In 2000, the couple divorced, but the decree made no mention of the annuity policy. *Id*. at 961. The decedent never changed the beneficiary designation after the divorce, though he did withdraw part of the value of the annuity. *Id*. He died in 2002. *Id*. Both the ex-wife and the husband's estate made claims to the annuity proceeds. *Id*. In support of

her claim, the ex-wife submitted an affidavit averring that decedent told her he intended that she remain as the beneficiary on the annuity policy, as he had hoped for a reconciliation and still loved her. *Id*. at 962. There was no other witness to this statement of the ex-husband's intent. The Arizona court concluded that if the donor wishes to rebut the presumption of revocation and retain a former spouse as the beneficiary post-divorce, the donor must evidence this intention in writing "and must otherwise comply with applicable policy terms." *Id*. at 967. The court reasoned:

> the purpose of A.R.S. § 14–2804(A) would be eviscerated if a former spouse could circumvent the automatic revocation effected by the statute by submitting self-serving testimony that the decedent spouse's inaction reflected an intention to revive his or her designation of the ex-spouse as the beneficiary. Even if Angelo told Pamela he intended to retain her as his beneficiary, he was required, if the statute is to have any effect, to confirm that decision in writing with Jackson National Life.

*Id*. at 966.

In reaching its decision, the *Lamparella* court relied in part on *Mearns v. Scharbach*, 12 P.3d 1048 (Wash. 2000). After his divorce, the decedent canceled one insurance policy naming his ex-wife as his beneficiary, but he told insurance agent that he wanted to keep a second policy and to leave his ex-wife as the named beneficiary. *Id*. at 1050. Further, perhaps not understanding the ramifications of the revocation-upon-divorce statute, the agent did not have decedent re-designate the now ex-wife as beneficiary. *Id*. The court rejected the ex-wife's bid for the policy proceeds, finding that the Washington legislature had intended to create an automatic, bright-line rule requiring a divorced donor to enact a written re-designation of the former spouse as the beneficiary. *Id*. at 1052. The court noted that the revocation statute "does not seek merely to discern the intent of the insured," but rather creates "a bright-line rule triggered by the date of dissolution or invalidation of marriage" and "evinces a legislative intent to encourage couples to

resolve estate planning questions when terminating their marital relationship." *Id*. at 1053. As a result of this fundamental purpose, the court concluded that oral statements of intent by the deceased donor are insufficient to contradict the operation of the statute. *Id*.

Similarly, in *Buchholz v. Storsve,* 740 N.W.2d 107, 109 (S.D. 2007), a couple divorced in 1975. For the next twenty years, the ex-husband (Storsve) was listed on her retirement plan account statements as the beneficiary, despite the fact that she got re-married to Buchholz in 1979. The wife took no action to remove Storsve as the beneficiary, and in 2006 she died, leaving her ex-husband as the named beneficiary. The South Dakota Supreme Court rejected Storsve's argument that his ex-wife's failure to designate a new beneficiary demonstrated her intent to keep him as the beneficiary of her retirement account. Citing *Lamparella*, the court noted that if mere inaction could demonstrate such intent, the entire purpose of the statute would be eviscerated. *Id*. at 112 ("Her inaction does not equate with consent."). And, while the court did not explicitly find that the statute creates a rebuttable presumption, it implied it by holding that the former spouse had "faile[ed] in his burden under SDCL 29A-2-804 to show Linda's inaction rises to a clear indication of a contrary intent to her decree of divorce from [Harold] and its complete division of their marital assets." 740 N.W.2d at 112. The court concluded that there must be a writing, created after the divorce, that specifically reaffirms the decedent's intention to have the ex-spouse benefit under the policy. *Id*. at 112-13.

In *Allstate Life Ins. Co. v. Hanson*, 200 F. Supp. 2d 1012, 1017 (E.D. Wis. 2002), the court found that Wisconsin's version of UPC § 2-804, Wis. Stat. Ann. § 854.15, "presumptively revokes" an ex-wife's interest in decedent's life insurance proceeds because it "only created a default rule" and did not prevent the decedent "from maintaining" his former spouse as his life insurance beneficiary. *Id*. at 1020. Instead, the decedent "merely had to perform some small

11

affirmative act indicating his intent." *Id*. For example, the court stated that he could have "altered the life insurance contract, executed some separate document, or even performed some informal act which [the former spouse] could use to show a court that she was still his intended beneficiary." *Id*. However, Wisconsin's version of UPC § 2-804 was slightly different than the New Mexico statute currently before this Court in that it contains a provision expressly contemplating the use of extrinsic evidence to construe the grantor's consent.[4]

After reviewing these cases and their reasoning, as well as the purpose and intent behind NMSA 1978, § 45-2-804 and UPC § 2-804, the Court finds the approach in *American General Life Ins. Co. v. Jenson*, 2012 WL 848158, Civ. No. 11-5057-JLV (D.S.D. Mar. 12, 2012) (unpublished) most logical and persuasive. The Court finds that § 45-2-804 creates a presumption that divorce revokes the designation of one's spouse as the beneficiary of an insurance policy, but that presumption can be rebutted if the former spouse meets his or her burden to do so by a preponderance of the evidence.

In *Jenson*, after his divorce the decedent expressed to his financial advisor his desire that his ex-wife (with whom decedent continued to live and act as spouse) should continue to be the beneficiary on his life insurance policy. *Id*. at *2. Other than this verbal declaration to the agent, the decedent took no affirmative steps to re-designate his ex-wife as the beneficiary. However, the decedent knew that his ex-wife had continued to pay the monthly premiums on the policy out of her own personal checking account, and he described the couple's agreement on this matter to his financial advisor. *Id*. at *2-3. Despite knowing that the decedent wanted his ex-wife to remain the beneficiary, the agent did not have him fill out a new designation-of-beneficiary form

---

[4] The Wisconsin statute states, in relevant part: "If the transfer is made under a governing instrument and the person who executed the governing instrument had an intent contrary to any provision of this section, then that provision is inapplicable to the transfer. Extrinsic evidence may be used to construe the intent." Wis. Stat. Ann. § 854.15(5).

because he did not believe it was necessary. *Id*. at *3. The court held that South Dakota's automatic revocation provision, SDCL § 29A-2-804 (also based on § 2-804 of the UPC) created a rebuttable presumption of revocation. Following the reasoning in *Davis* and *Hanson*, the court held that a showing of mere inaction by the decedent is insufficient to carry the would-be beneficiary's burden of proof. *Id*. at *15. In addition, "self-serving statements made by the decedent only to the beneficiary and not witnessed by any other person are insufficient." *Id*. (citing *Lamparella*, 109 P.3d at 961-65). On the other hand, the putative beneficiary can meet her burden either by "providing a writing from the decedent in compliance with the terms of the life insurance policy," or by presenting an admissible statement of the decedent's intent made to a third party with no interest in the beneficiary designation. *Id*. at *15.

In the case presently before this Court, under NMSA § 45-2-804(B)(1)(a) the Decedent's designation of Bertha as his beneficiary was revoked by operation of law at the time of their divorce. The question is whether Decedent took the necessary <u>affirmative</u> action to re-designate Bertha as his beneficiary at some point after the divorce. As explained above, most courts require such a re-designation to occur in writing in a form that is in compliance with the terms of the life insurance policy. Bertha argues that the Decedent made a written re-designation here, when he signed the Application for Term Conversion to authorize the creation of two policies from the single policy the couple previously shared. However, the Court disagrees. A review of the Application reveals that the information in it is almost entirely about the new policy being created and separated from the original policy. There is absolutely nothing in the Application for Term Conversion form signed by Decedent that would indicate to the signatory that he was "adopting" the same named beneficiary set forth in the original Policy application, or somehow

re-designating Bertha as his beneficiary. Thus, Decedent's signature authorizing the split is not sufficient to act as a written re-designation of beneficiary.

Similarly, the Decedent's inaction is not enough to overcome the presumption of revocation created by § 45-2-804. Here, Bertha argues that Decedent's inaction—that is, his refusal to fill out a form designating a new beneficiary—demonstrates his intent to keep her as the beneficiary on his policy. As the Tenth Circuit observed in *Stillman*, "[r]evocation-upon-divorce statutes reflect the legislative judgment that when the transferor leaves unaltered a will or trust or insurance beneficiary designation in favor of an ex-spouse, this failure to designate substitute takers more likely than not represents inattention rather than intention." 343 F.3d at 1317-18. It is this same legislative judgment that has prompted courts to hold that a failure to act is insufficient evidence of intent, and a donor must take affirmative steps to re-designate a former spouse as his beneficiary. *In re Estate of Lamparella*, 109 P.3d 959 (Arizona Ct. App. 2005); *Mearns v. Scharbach*, 12 P.3d 1048 (Wash. 2000); *Buchholz v. Storsve,* 740 N.W.2d 107, 109 (S.D. 2007); *American General Life Ins. Co. v. Jenson*, 2012 WL 848158, Civ. No. 11-5057-JLV at *15 (D.S.D. Mar. 12, 2012) (unpublished). This Court agrees with the court in *Buchholz*: if mere inaction by the Decedent could demonstrate intent, the entire purpose of the statute would be eviscerated. 740 N.W.2d at 112.

Bertha's final argument is that the presumption of revocation created by NMSA 1978, § 45-2-804 is rebutted by Decedent's verbal expression of his desire to retain her as the beneficiary. It is true that some courts permit a would-be beneficiary to rebut the presumption of revocation through a preponderance of admissible evidence, including the donor's verbal statements, expressing his or her intent. This Court agrees that it makes sense to permit the presumption of revocation to be rebutted in this manner. In this way, the statute can best meet its

purpose: to give force to the expressed intent of the divorced donor. However, courts must exercise caution in determining what evidence is acceptable. In this case, Bertha avers that the Decedent verbally expressed to her his intent to keep her as beneficiary. Bertha Guerrero Aff. at 10. However, there is no evidence that Decedent made that statement to a disinterested third party, such as Rael. In fact, Rael testified that Decedent never expressly told him that he wanted to keep Bertha as his beneficiary. Rael Depo. at 113. Instead, Rael merely inferred that intent from the Decedent's inaction on the matter. Rael Aff. at ¶ 23.

The Court holds that Bertha's evidence is insufficient to carry her burden to present proof, by a preponderance of the evidence, that Decedent actually intended her to be the beneficiary of the Policy despite their divorce. The Court agrees with the courts in *Lamparella* and *Jenson*: "self-serving statements made by the decedent only to the beneficiary and not witnessed by any other person are insufficient" because such evidence "has insufficient 'guarantees of trustworthiness' to carry the day." *Jenson*, 2012 WL848158 at *15 (citing *Lamparella*, 109 P.3d at 961-65).

Because Bertha has failed to rebut the presumption that her divorce from Decedent revoked his designation of her as beneficiary on the Policy, the Court concludes that summary judgment should be granted in favor of Decedent's estate.

**IT IS THEREFORE ORDERED** that *Defendant Imara Guerrero's Motion for Summary Judgment* [Doc. 38] is hereby **GRANTED**.

_____
**UNITED STATES DISTRICT JUDGE**